The score is now in session. Please be seated. Would the clerk call the next case, please? 3-1-0-0-0-3-0. In May, marriage of Marina Kemp, Adelaide Lake, Edward Place, Virginia, v. Gerald Kessler-Coffey, Jerome Shapiro. Mr. Shapiro, good morning. Good morning. May it please the court, counsel. My name is Jerome Shapiro, and I will present the appellant in this case, Gerald Kemp. This case involves the marriage of Gerald and Marina Kemp, which is approximately a 54-year marriage. Gerald is a retired postal worker who, in his financial affidavit filed with the trial court, set forth that he had an income at the time of the filing of the affidavit of about $2,200. In the affidavit, he also stated he had expenses of approximately $2,250 per month. In her affidavit filed with the court, Marina indicated that she had a monthly income of $354, which was derived, I believe, from the pension. The parties possessed certain marital assets, which consisted of a marital residence valued at $77,895, household furnishings valued at $5,000, a bank account, a joint bank account, the amount of $8,000, an annuity valued at just over $25,000, a life insurance policy with a death benefit of $10,000, a trailer in Florida valued at $2,500, on which it was $300 not rental due every month. The parties also owned two vehicles, some tools, jewelry, and some golf clubs. There was also testimony about a coin collection valued at $950, though Norita admitted in testimony that she had depleted it by using it for expenses. There were also savings bonds, and while neither party seemed to know what the exact value of those bonds were or even where they were located, Norita admitted in testimony that she had cashed in at least some of the savings bonds. The parties had also received a 2007 tax refund in the approximate amount of $1,661 and a federal stimulus check in the amount of $1,200. Now, at this point, it should be noted that we take the position that the life insurance policy had no real value. The only exception and the only time it had any value under federal regulations was that if Gerald was diagnosed with a terminal illness and had less than nine months to live, at that point he could apply for living benefit. Gerald had the condition called early Alzheimer's, which, while debilitating, there was no testimony or evidence that his illness is terminal or that he had only nine months to live. At the time of trial, Gerald was paying just over $314 a month for health insurance premiums for both he and Norita through the United States Postal System Insurance Program. However, federal regulations set forth in materials submitted to the court indicated that this amount would substantially increase once the parties were divorced. After trial, the trial court awarded Norita the marital residence and all of its contents, the bank account in the amount of $8,000, and her vehicle worth about $1,975. The trial court also awarded Norita $900 per month in permanent payments and ordered Gerald to continue to pay health insurance premiums for Norita out of his income. Gerald was awarded the annuity, which had an approximate value of $25,000, his tools, his golf clubs, a seat for his van, the tax refund and stimulus checks, the coin collection, which had been depleted by Norita, the savings bond, which, as I stated before, the value and location of which were unknown. He was also awarded the Florida trailer, but with that came the attendant obligation to pay the monthly rent on the trailer, and that monthly rent of $300 a month exceeded the actual value of the trailer. The sum total of the property awarded to Norita was $92,870. The ascertainable value of the property awarded to Gerald was $33,923. It is important to note again that regarding the life insurance policy, there was no evidence that it had any cash value and that the value of the remainder of the coin collection as well as the value and location of savings bonds was unknown. In short, excluding life insurance, which we believe had no cash value, Norita was awarded just over 73% of the property, while Gerald was awarded under 22% of the property. As this court knows, the standard of review in a property division is whether the trial court abused its discretion. An abuse of discretion occurs where a court acts arbitrarily and without employing its conscientious judgment, or where it exceeds the bounds of reason and ignores recognized principles of law, so that substantial injustice arises. Gerald submits that the property division made by the trial court in this case, awarding Norita almost three quarters of the marital property was extremely inequitable, particularly in light of the award of the substantial maintenance to her in the amount of $900 per month, as well as imposing the obligation upon Gerald to continue to pay Norita's health insurance premiums post-divorce out of his income. Now, the Marriage and Dissolution Act, 750 ILCS 503D, sets forth factors that the trial court must consider in making a division of the marital property. Those factors would be considered without any regard to the conduct of the parties. While the trial court did not specifically set forth the factors it relied upon in making the division of the assets in this case, Gerald submits that several of the relevant factors which the trial court should have taken into account here out of those listed in the statute were the value of the property assigned to each spouse, the duration of the marriage, the relevant economic circumstances of each spouse when the division of the property is to become effective, including the desirability of awarding the family home, the age, health, station, occupation, amount, and sources of income, and the needs of each of the parties, whether the apportionment is in lieu of or in addition to maintenance. Now, of course, there are 12 factors, I believe, set forth in the statute. Those, we believe, are the most relevant here. Mr. Shapiro, I want to ask a question about the insurance provision. The judgment to me states that he is to provide her health insurance so long as it's available for the 36 months under the U.S. Postal Service. That's not the way we read it. We read it that he's to provide it as long as it's available, which we don't know that there's any limitation in that. We think federal regulations may impose a 36-month limit, but I don't know that the trial judge intended that. No, that's not our reading. So, I mean, through the U.S. Postal Service, I mean, it is a matter of law. 36 months is all that COBRA is allowed. Are you saying you don't know that? Well, that's what we think. But federal regulations are very unclear as to the amount of the contribution, as to the duration. It's even unclear as to whether Narita will be, whether the United States Postal Service insurance system will allow her to continue to be covered. But our reading of the trial judge's, I'm sorry. The exhibit that you submitted, which is the personalized information regarding his benefits, it's 16 where it says that these are the benefits that you receive. And the health insurance benefits specifically say that someone who, family members who lose coverage under your plan, a former spouse, may qualify for temporary continuation of coverage for up to 36 months. You don't read that as saying that former spouses get 36 months, or up to 36 months is what the law allows for them? As I said, I think that's entirely, certainly a way to look at that, and that's what it says, and that may well be the case. But I don't know that the trial judge, that was his intent in making this decision. I believe your reading of that is correct, yes. I don't disagree with you at all. But again, the regulations are somewhat vague, though that is clear. It appears that it may be limited to 36 months. Whether the trial judge interpreted it that way, whether that's his intent, I can't say. So as I read then the judgment for dissolution of marriage, where it says that he should keep the plaintiff's health insurance through the US Postal Service. You're saying that the should is a shall, and that he is to keep her on his US Postal Service health insurance forever? Well, I think the trial judge- Oh, you meant that- I can't, I can't, the trial judge said what he said. And I think the trial judge's intent was that Gerald would keep Narita on that insurance. Now, that insurance may be limited, and we submitted those materials to the trial judge. I don't recall him necessarily alluding to those in rendering his decision, but I agree with your honor that it may be limited to 36 months. Whether he intends it to be limited, whether he intends to at some point impose any future obligation, I can't answer that. I mean, I think that's a tremendous question when you're talking about asking us to find an abuse of discretion, because if it's a limited 36-month period, or if it is for the remainder of her life, I think that that is, that poses a tremendous question for this panel. I would agree with your honor. However, our position is that in light of the award of maintenance, and the way we view this judgment is we view it in its totality. I don't think you can cherry pick one portion of the judgment from another. I've talked about the property where the trial judge awarded Narita a vast amount of the property, a disparate amount in our opinion. He awarded her $900 per month in maintenance. And then on top of that, as the court knows from the cases, I believe it was the Florida case, an award of health insurance basically is an additional award of maintenance. And so he awarded maintenance upon maintenance. We think that in and of itself is an abuse of discretion. We don't think that's a reasonable award. We don't think a reasonable man would think that's a reasonable award. So even if it's limited to 36 months, it's still a very substantial obligation for Mr. Kemp to bear. But I don't disagree with your reading that it may be limited. It may well be. But it's still a substantial obligation. It still is maintenance pending. It's in our opinion. It still exceeds the bounds of reason as to what is a reasonable award in this case. Now- Mr. Steele, how old are the parties? Mr. Kemp, I believe, Your Honor, is around 76, I want to say at this point. The time of trial around 75, and I think Mrs. Kemp was 73. So they are quite elderly. So in this case, we think you have to view the totality of the award as I stated. The award, when you look at each separate provision of the award, you look at the property, that might not in and of itself be a reasonable award. If you look at the maintenance, that in and of itself might not be an unreasonable award, in view of the circumstances. If you look at the health insurance requirement that Mr. Kemp has, that might not be an unreasonable award. But when looked at in totality, when looked at all together, Mrs. Kemp not only walked away with a drastically disparate share of the property, as we said, over 73 percent, she walked away with half of the marital income, and she walked away, in addition to that, with an award of health insurance premiums. All of those obligations are Mr. Kemp's to bear. And we think, again, that exceeds the bound of reason. We understand an equal division is not required with the property. But in this case, again, when considered all together, when we consider all those factors together, we think the award was unreasonable. Thank you. Thank you, Your Honor. Thank you. Are there any questions for Mr. Chairman? Mr. Glazer? Good morning. Good morning, Your Honor. May it please the Court, Counsel? I guess the first issue to address is the division marital property, and there is the claim that there's no value to the U.S. savings bonds or the $10,000 life insurance policy. Well, first of all, I believe it's implicit in the Court's decision that he found there was value. He did not make a finding, there are no savings bonds, they've all been cashed in, they've been burned, they're lost. He made a finding that they existed, and he awarded them to Mr. Kemp. He did the same thing with the life insurance policy. Did he find a value and assign a value to the savings bonds? I had trouble finding. If you look at Exhibit 1, attached to my argument, that was an exhibit from the trial that lists all the savings bonds. There were 63 separate $50 savings bonds. They were all well past their date of maturity, so that would be the value of $3,150. Exhibit No. 3, attached to my brief, is the life insurance that we've been discussing. I just want to go back just for a second to the savings bonds, because your client testified that she did cash some of those in. It was somewhere between one and five for, I don't know, if it was for real estate tax or for some purpose. But they were all $50 bonds? Yes, ma'am. Okay, so at most it would have been $250? That she would have spent, yes. Okay, thank you. As far as Exhibit No. 3, which talks about the life insurance policy, it doesn't talk about debt benefit. It talks about value. So I think that the court found that there was a $10,000 value to this life insurance policy, because it's recited over and over again in that two-page exhibit. There's certainly a distinction between debt benefit and value, and they repeatedly say, this is the value at this time, this is the value at this time. So we believe that there is a value to that asset. The third issue as far as the division of property is the amount of residence. There was an appraisal for about $77,000, but I believe there was testimony from my client corroborated by Mr. Kemp that there was now $10,000 worth of roof repairs and other maintenance necessary, decreasing the value of that asset. If you decrease the value of that asset and add the savings bonds and the life insurance policy to Mr. Kemp's side of the ledger, my client would have received just under $80,000, and Mr. Kemp would have received just under $50,000, which would be my client receiving 61.5% and Mr. Kemp 38.5%. The Gentry case upheld the decision where the wife was awarded 66% and the husband 34%, and there they talk about that this can only be overturned with the showing of abuse of discretion. They go on to define it, and they say, an abuse of discretion will be found where a court acts arbitrarily and without employing its conscientious judgment or where it exceeds the bounds of reason and ignores the recognized principles of law so that substantial justice arises. Now, the court heard this trial, took it under advisement, made a decision. There was a motion to reconsider file that eventually kind of evolved into a motion to vacate the judgment. The judge considered that and allowed that motion, and the purpose of that was concerning the life insurance, I'm sorry, the health insurance. So the court considered it when he made his original decision. He considered it again when he allowed the motion to vacate, and then when it was subsequently called and there was no evidence as to what the true cost of maintaining my client on that health insurance would be other than speculation, he reinstated the original judgment. So he conscientiously made that ruling three separate times. Can I ask a question? So the exhibit from the U.S. Postal Service regarding costs that are specific to Mr. Kemp, it's your opinion that neither of you or the court consider that as true cost? That, it's my recollection, that document was not provided during the trial of this case. But that was offered during the motion to reconsider, correct? Well, the court basically said it's not the subject matter for motion to reconsider because he's not reconsidering evidence that he already heard. So the appropriate remedy would be to vacate the judgment, have a new trial, and attempt to introduce such evidence. And then when that time occurred, it was only speculation as to what would happen if Mrs. Kemp was kept on the insurance because Mr. Kemp didn't even attempt to put around to see, okay, well, now my premiums are going up. They're taking much more money out from me. It was too speculative, and the court went back to the original judgment. And do you read the judgment as Mr. Kemp being required to carry his wife's life or health insurance for the remainder of her life, or is that so long as it's available through the U.S. Postal Service? I read it to be that as long as it's available through the post office. As you see in many other dissolution cases where if it's available through the place of employment, you're ordered to keep it. If for some reason it's no longer available, you would not be under an obligation to secure private insurance. Thank you. So the court divided the property as it saw fit, and it should not be disturbed, absent, and abuse of discretion. And using the definition set forth in the Gentry case, that is not seen here. As far as the maintenance and health insurance, I'll lump those arguments together. There's no real factual dispute as to the monthly incomes. My client receives $361. Mr. Kemp $2,769, $250 of which is taken for taxes, and $314 for the cost of the insurance that insures both parties, leaving him $2,204. And I think it's not coincidental that if you take the monthly maintenance sum of $900 and subtract it from the $2,200, Mr. Kemp is left with $1,304. And taking the $900 and adding it to the $361 that my client receives, she has $1,261. So I think it's actually evidence that the court was trying to level the playing field so that once the tax and the insurance was paid, they would have roughly the same amount of money to live on. So, again, the maintenance of a 54-year marriage, my client, as far as her health conditions, that was evidence of open-heart surgery, that she had diabetes. She was taking 12 prescriptions routinely at a cost of $150 per month co-paid. Mr. Kemp, there was some argument that he's got early onset Alzheimer's. But if you look at the, again, another exhibit in my brief, the doctor says that his functioning and his tests are within the normal range for a 76-year-old person. And that they really can't tell for sure because there were no cognitive tests done prior to this to say, well, okay, when you were 66, you were at this level, now you're 76 and there's a decline. In fact, I think the report says that there would have to be some testing in the future to confirm the diagnosis. So I don't think, I think that her health, her health issues are relevant to his or not. In the Liberty case, the appellate court upheld a denial of maintenance where the wife was making $8,000 per year and the husband was making much more than that. But the appellate court in that case said that should the wife's present employment terminate, it appears that she could anticipate an award of maintenance. Here in the case of Barr, Mr. Kemp testified he was living with his girlfriend. He had no mortgage. He had no rent. And I believe that is a factor the judge took into consideration. And more importantly, the judge also said that if certain conditions change, he could modify maintenance. In theory, if Mr. Kemp's girlfriend threw mud on his ear and now he has nowhere to go, he could seek a change. If his finances changed, he could seek a modification. So we believe that that would be the remedy in the event that that happens, but that the award of maintenance is proper in this case. Remedy also says that even if you would have come up with a different decision in the trial court, the trial court is given high deference and can't be overturned absent an abuse of discretion. And they define, in that case, an abuse of discretion only where no reasonable person would adopt the view taken by the trial court. And we believe the division of the property and the award of maintenance leveling the field, where they both have about the same amount of money from what to live on, that is certainly reasonable. And we would ask you to affirm the judgment of the trial court. Any questions? Thank you, Mr. Glazer. Thank you. Mr. Shapiro, any rebuttal? Thank you, Your Honor. A couple of things that came up here, Mr. Glazer. One was the savings bonds. Mrs. Kemp, when there was introduced a trial, a list of savings bonds that the parties had at one point, the testimony was very vague and unclear by both parties as to where those savings bonds were. Mr. Glazer correctly stated, Mrs. Kemp stated she had cashed some of them in. I can't say as I stand here, I remember the exact number. But the point is that at trial, nobody really knew where these savings bonds were. Nobody knows whether they had been cashed in. Nobody knows whether they still existed. Frankly, nobody knew where they were. So in our opinion, in our awarding these savings bonds, the existence of which I think can even be called into question, was somewhat of an illusory award. Mr. Kemp, frankly, didn't know where they were. Mrs. Kemp didn't know where they were. So I don't know how he was going to receive that asset. The same essentially holds, although it's a much smaller asset, holds true with regard to the coin collection. I guess that still existed, but some of it had been depleted. Now, as far as the health insurance provision, Your Honor, I did look at the judgment when I had an opportunity to get back to the table. And the answer to the question is, the judgment says he will maintain it, to quote the judgment, keep her on his insurance, keep the plans health insurance through U.S. Postal Service. And so if they limit it to 36 months, it may well be that at the end of that 36 months that that will terminate. The document to which you referred, Your Honor, and to which Mr. Glazer was asked about, was introduced at the motion to reconsider. It wasn't available at the time of trial. It came during the period between trial and post-trial motions and was presented to the court. And that's not our document. We didn't create that document, Your Honor. That's a document Mr. Kemp received from the United States Postal Service. Now, we understand trial courts are allowed a great deal of deference. They have the opportunity to view the witnesses. We understand that the standard is whether the trial court committed abuse of discretion, really with regard to all the points, the property division, the maintenance, and then what I like to call the award of maintenance upon maintenance, which is the requirement that Mr. Kemp keep Mrs. Kemp insured on his health insurance policy. So the standard is, whether there was abuse of discretion, whether the award exceeded the bounds of reason, in our opinion, while this court certainly cannot, nor are we urging it to substitute for the trial court, what we are saying is this trial court, and every case has to be determined on its facts, what we are saying is this trial court has the right, and we are here asking this court, to review the entire award, the totality of the award. Counsel, you have one minute. Thank you. And I mentioned the string argument. I can't stress it enough. The totality of the award. Mr. Glazer mentioned that the trial judge tried to level the playing field in regard to income. Well, the playing field certainly was not leveled when you look at the totality of the award. And we still maintain the life insurance policy. While somebody may think it has cash value, there are specific rules under which that cash value may be used. And that's only, it basically is terminal illness, which he does not have. That was an illusory award in our opinion. So these two final awards that they talk about where it's reductions and it says, originally your option A, family standard insurance, was $16,000. Now it's going to bottom out at $4,000. And then the $10,000, which was basic life option A, which covered his life, bottoms out at $2,500. You're saying that that is only if he's under some disability? Our reading of that is he can't access any of that money while he's alive unless he has a terminal illness and has been diagnosed as having less than nine months old. That's the way we read that. Now, again, federal regulations are certainly always subject to interpretation. That's the way we read that. So we don't think it has any cash value. If he's diagnosed with a terminal illness and has less than nine months to live, then certainly he can. No question about it. But we're not at that point. He has a debilitating condition early on in Alzheimer's but has not been diagnosed in the manner that I mentioned. But it is a value to him if he were to develop a deadly terminal illness. God forbid he should, Your Honor, yes. In that case, it would be of some value, yes. Thank you. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court now stands in brief recess for a panel change.